DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By: ANTHONY J. SUN
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2810
Fax: (212) 637-2786
anthony.sun@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN IRON AND METAL COMPANY, INC., CULP INDUSTRIES, INC., PARAMOUNT GLOBAL, PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE,<br><br>Defendants. | **COMPLAINT**<br><br>No. 22 Civ. 7800 |

Plaintiff United States of America, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

## NATURE OF THE ACTION

1. American Iron & Metal Co., Inc. ("AIM"), Culp Industries, Inc. ("Culp"), Paramount Global ("Paramount"), and Public Service Company of New Hampshire ("PSNH") (collectively, "Defendants") arranged for the disposal or treatment of scrap mercury by Port Refinery Co., Inc. ("Port Refinery"), a mercury refinery business operated out of a residence at

what has been designated by EPA as the Port Refinery Superfund Site in the Village of Rye Brook, Westchester County, New York (the "Site").

2. Port Refinery's treatment and processing of the scrap mercury sent by Defendants and other parties led to extensive releases of mercury, a hazardous substance, requiring two separate clean-up actions ("removals") by EPA under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9604.

3. The United States brings this action to recover costs incurred in the second removal and for a declaratory judgment pursuant to Sections 107 and 113(g) of CERCLA, 42 U.S.C. §§ 9607 & 9613(g)(2).

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 42 U.S.C. §§ 9607(a) & 9613(b) and 28 U.S.C. §§ 1331 & 1345.

5. Venue is proper in the Southern District of New York pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. §§ 1391(b) & (c) because the releases or threatened releases of hazardous substances giving rise to the United States' claims occurred in this District and because the Site is located in this District.

## THE PARTIES

6. Plaintiff is the United States of America, acting on behalf of EPA.

7. Defendant AIM is a Canadian corporation with offices at 2160 Moreau Street, Montreal, Quebec, Canada. AIM is a scrap dealer that purchases metal from small scrap dealers, industrial accounts or demolition companies and re-sells it either to end users or to refineries that

purchase secondary metals for purposes of refining and subsequent sales. During the 1980s, AIM collected scrap mercury, which required treatment, for resale in the scrap metals market.

8. Defendant Culp is an Alabama corporation with offices at 175 Jester Parkway, Rainbow City, Alabama. Culp is an iron and scrap metals dealer that, in the 1970s, disposed of scrap mercury inventory.

9. Defendant Paramount is a Delaware corporation with offices at 1515 Broadway, New York, New York. Paramount is global media and entertainment company. Paramount's legacy operations used mercury in the manufacturing of electrical lighting, electrical tubes, and industrial motors, which contained mercury. In the 1970s, it disposed of mercury residue and/or arranged for its treatment.

10. Defendant PSNH is a New Hampshire corporation with offices at Energy Park, 780 North Commercial Street, Manchester, New Hampshire. PSNH was at all relevant times an electric utility company. As part of its business operations in the 1960s, PSNH used boilers and instrumentation containing mercury, and in the 1980s it disposed of the used mercury and/or arranged for its treatment.

**THE CERCLA STATUTORY SCHEME**

11. In 1980, CERCLA was enacted to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and for funding the costs of such abatement and related enforcement activities, which are known as "response actions." 42 U.S.C. §§ 9601(25), 9604(a).

12. Section 104(a)(1) of CERCLA provides, in pertinent part:

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or

> contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment. . . .

42 U.S.C. § 9604(a)(1).

13. For purposes of enforcing CERCLA, the Administrator of EPA is the President's delegate, as provided in operative Executive Orders, and, within certain limits, the Regional Administrator and Superfund and Division Director of Region 2 of EPA have been re-delegated this authority.

14. The term "release" is defined in Section 101(22) of CERCLA to include:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant). . . .

42 U.S.C. § 9601(22).

15. The term "hazardous substance," as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), includes hazardous wastes and other chemicals and substances designated under specified environmental statutes and regulations. Mercury is among the hazardous substances listed in the regulations promulgated under CERCLA at 40 C.F.R. § 302.4, App. A, and is a hazardous substance within the meaning of Section 101(14) of CERCLA.

16. Under Sections 104(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9604(a) & 9607(a), EPA, upon determining that there is a release or a substantial threat of release of a hazardous

substance that warrants response actions, may undertake the response actions itself and later seek reimbursement from the responsible parties by way of a cost recovery action.

17. Section 107(a) of CERCLA specifically provides, in pertinent part, that:

> (3) any person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . shall be liable for—
>
> (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; . . .

42 U.S.C. § 9607(a).

18. The term "person," as used in CERCLA, includes, *inter alia*, "an individual, firm, corporation, association, partnership, [or] . . . commercial entity . . . ." 42 U.S.C. § 9601(21).

19. The term "facility," as used in CERCLA, is defined broadly to mean "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9).

20. Section 113(g) of CERCLA provides that, after an initial cost recovery action, the United States may initiate "[a] subsequent action or actions [under Section 107 of CERCLA] for further response costs at the . . . facility." 42 U.S.C. § 9613(g).

## STATEMENT OF FACTS

### I. The Site

21. The Site is located in a residential neighborhood in the Village of Rye Brook, Westchester County, New York, and includes the parcel of land located at 55 Hillandale Road in Rye Brook (the "Source Property"), the buildings and other structures located or formerly
located on the Source Property, and the properties adjacent to the Source Property where mercury came to be located (the "Affected Properties"). At all times relevant to this complaint, the Source Property consisted of approximately 0.7 acres of land and, until they were removed by EPA, a two-story residence, a swimming pool with a poolside cabana structure, a shed, and a two-story garage with a small basement.

22. Until approximately 2000, the Source Property was owned by Edmund and/or Norma Barbera.

23. Until approximately 1991, the Source Property was the site of Port Refinery, a then-existing New York corporation that was owned and operated by Edmund Barbera.

24. At all times relevant to this complaint, the Source Property was bordered by private residences on its south, east, and west sides. A private, multi-family complex borders the Source Property on its north side.

25. A high school is located approximately ¼ mile from the Source Property. A hospital and numerous commercial enterprises and residences are also located within approximately one mile of the Source Property.

II. Mercury Contamination at the Site

26. For approximately twenty years prior to 1991, Port Refinery was engaged in the business of mercury reclaiming, refining, and other processing.

27. Port Refinery advertised itself in metal industry trade publications as a processor of mercury "scrap" and "residue."

28. Used or scrap mercury and scrap materials containing mercury (collectively, "scrap mercury") have impurities that render them useless for common commercial and industrial purposes. To attain the levels of purity needed for commercial and industrial uses of

mercury, scrap mercury must be processed to remove impurities. The processing of scrap mercury to render it suitable for commercial or industrial use results in a waste by-product that contains mercury, which must be disposed of. The processing of scrap mercury described above also changes scrap mercury's physical and chemical character by removing impurities.

29. Each of the Defendants arranged for the sale and the transport of scrap mercury for treatment or disposal that came to be located at the Site either directly or through a third-party.

30. In March 1980, AIM sold 1,033 pounds of scrap mercury to Port Refinery for treatment or disposal. Around that time, AIM would receive smaller quantities of used mercury from suppliers across Canada, which it commingled into large flasks. AIM had no written procedures for the handling of mercury, did not take any steps to ensure purity other than a visual inspection for sediment, and classified the mercury as "scrap." AIM sold the mercury to Port Refinery at a discounted price compared to the then-prevailing market rate for commercial-grade mercury. AIM expected its purchasers to package and prepare the mercury for their own customers. Based on its experience in the metals industry, AIM knew or should have known that "scrap" mercury required treatment to have any commercial value.

31. In 1974, Culp arranged for the sale and transport of a total of 527 pounds of "scrap" mercury to Port Refinery for treatment or disposal. The mercury was sold at a price 8% below the lowest market price for commercial mercury at the time. Culp knew or should have known that Port Refinery was in the business of treating mercury and would treat the "scrap" mercury received from Culp.

32. In 1973, Paramount arranged for the transport of at least 600 pounds of mercury residue to a third-party who ultimately transported the mercury to Port Refinery for refining,

from which 250 pounds of mercury was recovered at Paramount's expense. Paramount knew or should have known that this mercury residue required treatment to be refined into commercial-grade mercury.

33. In September 1983, PSNH sold 23 steel flasks containing 1,754 pounds of used mercury containing titanium or magnesium to a third-party broker who ultimately transported the mercury to Port Refinery for treatment or disposal. PSNH knew or should have known that this used mercury containing titanium or magnesium required treatment to have any commercial value.

III. The First Removal

34. As a result of Port Refinery's business operations relating to reclaiming, refining, and processing scrap mercury, including the disposal of the waste those processes created, the structures at the Source Property as well as soil, surface water, and groundwater at the Site became extensively contaminated with mercury.

35. To address the release or threatened release of mercury, EPA conducted a first removal between 1991 and 1996 (the "First Removal").

36. Over the course of the First Removal, EPA discovered (i) mercury vapor inside the garage on the Source Property, (ii) mercury in and on the structures, including the walls, the floors, the window sills, and the ceiling beams, on the Source Property, and (iii) mercury in the soils and sediments of both the Source Property and the Affected Properties.

37. As part of the First Removal, EPA undertook response activities that included (i) fencing the Source Property to restrict public access to it, (ii) soil sampling, (iii) removing and disposing of contaminated soils and other materials from the Source Property and the Affected Properties, (iv) demolishing the contaminated garage building and the contaminated pool cabana

structure, and (v) restoring the properties from which contaminated soils and other materials had been removed. The United States incurred over $6.4 million of response costs during the course of the First Removal.

IV.     The 1996 CERCLA Action

38.     On November 14, 1996, the United States commenced a civil action in this Court, seeking recovery of the costs that the United States had incurred during the course of the First Removal. The United States sought recovery of its costs from the owners/operators of the Site and from the parties who arranged for the disposal or treatment of hazardous substances at the Site.

39.     From approximately June 1997 to approximately May 2002, the United States entered into six separate consent decrees in connection with the First Removal.

40.     AIM, Culp, and Paramount were parties to the lawsuit and resolved their liability for the First Removal in a third partial consent decree, entered on March 29, 1999. This third partial consent decree contains a covenant not to sue by the United States as to response costs incurred through August 30, 1998, only, and does not prevent the United States from suing to recover any response costs it incurred after that date.

41.     PSNH was party to the lawsuit and resolved its liability for the First Removal in a fourth partial consent decree, entered on June 9, 2000. This fourth partial consent decree contains a covenant not to sue by the United States as to response costs incurred through November 18, 1999, only, and does not prevent the United States from suing to recover any response costs it incurred after that date.

V.      The Second Removal

42.     In approximately April 2004, EPA received a report of mercury in or around a

paved area near the Source Property. Prior to receiving this report, EPA was not aware of any remaining mercury at the Site.

43. Following its receipt of the April 2004 report, EPA initiated a second removal (the "Second Removal") at the Site, which included soil sampling and excavation and disposal of mercury-contaminated soil. EPA's soil sampling results indicated that the mercury contamination detected in April 2004 had originated from the Source Property.

44. Subsequently, EPA discovered two sub-surface vaults on the Source Property that contained numerous empty bottles, cylinders, and other laboratory containers. These containers had been used to transport and handle mercury.

45. During the course of the Second Removal, EPA conducted numerous activities, including, among other things (i) excavating and disposing of more than 9,300 tons of mercury-contaminated soil from the Site; (ii) installing air and water filtration systems for residences on the Source Property and a nearby Affected Property; (iii) removing the two sub-surface vaults located on the Source Property containing mercury-contaminated containers; (iv) removing contaminated pond sediments; (v) demolishing the residence on the Source Property; (vi) cleaning up the underground pipes at the Source Property; (vii) compensating the current residents of the Source Property for the demolition of their residence; (viii) backfilling the excavated land; (ix) restoration work; and (x) air and water sampling and analysis.

46. The Second Removal was conducted in response to releases or threatened releases of mercury, a CERCLA hazardous substance at the Site, and constitutes a response action within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

47. The United States' costs of the Second Removal were not inconsistent with the National Contingency Plan (the "NCP"), 40 C.F.R. Part 300.

48. The Second Removal cost the United States more than $7 million.

49. The United States has subsequently sued twenty-one other responsible parties for costs incurred in the Second Removal, *see United States v. Jacob Goldberg & Son, Inc., et al.*, No. 10 Civ. 3237 (CS); *United States v. Monroe Iron & Metal Co., Inc., et al.*, No. 17 Civ. 6217 (VB); *United States v. Steel of W. Va., Inc.*, No. 18 Civ. 1661 (KMK); *United States v. Columbia Gas Transmission LLC, et al.*, No. 19 Civ. 2490 (KMK); *United States v. Cytec Industries, Inc., et al.*, No. 20 Civ. 6916 (NSR); *United States v. E.I. DuPont de Nemours & Co., et al.*, No. 21 Civ. 6970 (NSR).

**FIRST CAUSE OF ACTION**

50. The United States repeats the allegations in paragraphs 1 through 49.

51. The Site is a facility within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

52. AIM, Culp, Paramount, and PSNH are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

53. There have been releases of hazardous substances within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and threatened releases of hazardous substances, at or from the Site.

54. Subsequent to November 18, 1999, the United States incurred response costs within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), while responding to the releases and threatened releases of a hazardous substance at the Site.

55. AIM, Culp, Paramount, and PSNH are jointly and severally liable to the United States for any response costs incurred in connection with the Second Removal because, under

Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), they arranged for the disposal or treatment at the Site of a hazardous substance they owned or possessed.

## SECOND CAUSE OF ACTION

56. The United States repeats the allegations in paragraphs 1 through 55.

57. Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the United States is entitled to a declaratory judgment that Defendants are jointly and severally liable to the United States for any future response costs, not inconsistent with the NCP, incurred in connection with the Site.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that the Court:

(i) Enter judgment against Defendants jointly and severally, and in favor of the United States, for the response costs incurred by the United States in connection with the Second Removal, in an amount to be established at trial;

(ii) Grant a declaratory judgment in favor of the United States that Defendants are jointly and severally liable for all future response costs to be incurred by the United States in response to the release or threatened release of hazardous substances at the Site; and

(iii) Order such further relief as the Court may deem just and proper.

Dated: September 13, 2022
       New York, New York

                                        DAMIAN WILLIAMS
                                        United States Attorney

                         By:  s/ Anthony J. Sun
                                        ANTHONY J. SUN
                                        Assistant United States Attorney
                                        86 Chambers Street, 3rd Floor
                                        New York, NY 10007
                                        Telephone: (212) 637-2810
                                        Fax: (212) 637-2786
                                        anthony.sun@usdoj.gov

Of Counsel:

WALTER S. M. SAINSBURY
U.S. Environmental Protection Agency
290 Broadway, 17th Floor
New York, NY 10007
Telephone: (212) 637-3177
sainsbury.walter@epa.gov