UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

AMERICAN IRON AND METAL COMPANY, INC., CULP INDUSTRIES, INC., PARAMOUNT GLOBAL, PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE,

    Defendants,

No. 22 Civ. 7800 (CS)

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION TO ENTER THE PROPOSED CONSENT DECREE**


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Telephone: 212-637-2810
Facsimile: 212-637-2786
anthony.sun@usdoj.gov
*Attorney for the United States of America*

*Of Counsel:*
ANTHONY J. SUN
Assistant United States Attorney

Plaintiff United States of America (the "Government" or the "United States"), by and through its attorney Damian Williams, United States Attorney for the Southern District of New York, acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), respectfully submits this memorandum of law in support of its motion to approve the proposed Consent Decree between the Government and the defendants in this matter, American Iron & Metal Co., Inc. ("AIM"), Culp Industries, Inc. ("Culp"), Paramount Global ("Paramount"), and Public Service Company of New Hampshire ("PSNH") (collectively, "Settling Defendants"), which was lodged with the Court on September 13, 2022 (the "Consent Decree"). *See* Dkt. No. 3.

## PRELIMINARY STATEMENT

The proposed Consent Decree resolves the claims in the Government's complaint against Settling Defendants to recover response costs incurred by EPA in connection with the Port Refinery Superfund Site (the "Site") in Rye Brook, New York, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601 *et seq*. Pursuant to the proposed Consent Decree, Settling Defendants, among other things, agree to pay a total of $437,255; make certain admissions related to Site; and agree to certain document retention and certification obligations. In exchange, among other things, the United States agrees to resolve certain present and future claims against Settling Defendants for recovery of response costs at the Site.

The United States published notice of the lodging of the proposed Consent Decree in the *Federal Register* on September 16, 2022, *see* Notice of Lodging, 87 Fed. Reg. 56,983 (Sept. 16, 2022), and accepted public comments through October 17, 2022. The United States did not receive any comments on the proposed Consent Decree.

The Settling Defendants have consented to the entry of this Consent Decree without further notice. *See* Dkt. No. 3-1, ¶ 36.

Thus, for the reasons set forth below, the United States respectfully requests that the Court approve the proposed Consent Decree as fair and reasonable, and sign and enter the proposed Consent Decree.

## BACKGROUND

### I.  Statutory Background

In 1980, CERCLA was enacted to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and for funding the costs of such abatement and related enforcement activities, which are known as "response actions." 42 U.S.C. §§ 9601(25), 9604(a); *see also United States v. Bestfoods*, 524 U.S. 51, 55 (1998).

Under sections 104(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9604(a) & 9607(a), EPA, upon determining that there is a release or substantial threat of release of a hazardous substance that warrants a response action, may undertake the response action itself and later seek reimbursement from the responsible parties by way of a cost recovery action. Congress was cognizant that the CERCLA Superfund alone cannot finance the clean-up of all hazardous waste sites nationwide, *see* S. Rep. No. 96-848, at 17-18 (1980), thus it enacted a strict liability cost recovery scheme to enable EPA to recover clean-up costs from potentially responsible parties ("PRPs"). *See* 42 U.S.C. § 9607(a); *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992) (recognizing a key purpose of CERCLA is to hold PRPs liable for clean-up costs). PRPs can include current or former owners and operators of sites where there is a release or threat of a release of a hazardous substances, as well as parties who arrange for the treatment or disposal of hazardous substances at such sites. *See* 42 U.S.C. § 9607(a).

In establishing the framework for recovery of federal clean-up costs, Congress expressed a strong preference for the Government to settle with PRPs to avoid expending resources on litigation, rather than on clean-up. *See* 42 U.S.C. § 9622(a); *see also* H.R. Rep. No. 253, Pt. 1, *reprinted in* 1986 U.S.C.C.A.N. 2835; *In re: Cuyahoga Equipment Corp.*, 980 F.2d 110, 119 (2d Cir. 1992). To encourage such settlement, Congress has provided that a party settling with the Government also receives protection from any contribution claims for matters addressed in the settlement. 42 U.S.C. § 9613(f)(2); *see also Cannons Eng'g Corp.*, 899 F.2d 79, 92 (1st Cir. 1990).

## II.     Factual Background

As set forth in the complaint in this action, Settling Defendants arranged for the disposal or treatment of scrap mercury by Port Refinery Co., Inc. ("Port Refinery"), a mercury refinery business operated out of a residence at what has been designated by EPA as the Port Refinery Superfund Site in the Village of Rye Brook, Westchester County, New York (the "Site"). *See* Compl. (Dkt. No. 1) ¶ 1; *see also id.* ¶¶ 29–33. As further alleged in the complaint, Port Refinery's treatment and processing of the scrap mercury sent by Settling Defendants and other parties led to extensive releases of mercury, a hazardous substance, requiring two separate clean-up actions ("removals") by EPA under Section 104 of CERCLA. *See id.* ¶ 2. The United States brought this action to recover costs incurred in the second removal and for a declaratory judgment. *See id.* ¶ 3.

For approximately 20 years prior to 1991, Port Refinery was engaged in the business of mercury reclaiming, refining, and other processing. *See id.* ¶¶ 26–28. Settling Defendants arranged for the sale and the transport of scrap mercury for treatment and disposal that came to be located at the Site. *See id.* ¶¶ 29–33. As a result of Port Refinery's business operations relating to reclaiming, refining, and processing scrap mercury, including the disposal of the

3

waste those processes created, the structures at the Site as well as soil, surface water, and groundwater at the site became extensively contaminated with mercury. *See id.* ¶ 34. EPA conducted a first removal between 1991 and 1996 to address the release or threatened release of mercury. *See id.* ¶¶ 35–37.

In approximately April 2004, EPA received a report of mercury near the Site. *See id.* ¶ 42. Thereafter, EPA conducted a second removal at the Site. *See id.* ¶¶ 43–48. The United States seeks to recover response costs incurred in connection with the second removal. *See id.* ¶¶ 54–55.

### III.   The Proposed Consent Decree[1]

The proposed Consent Decree requires Settling Defendants to pay response costs, in aggregate, of $437,255. *See* Dkt. No. 3-1, ¶ 9 & App. A. To ensure that Settling Defendants will comply with their payment obligations, the proposed Consent Decree subjects Settling Defendants to interest and penalties for failure to comply with its payment obligations in the event of default. *See id.* § VII, ¶¶ 12–13. In addition, to guarantee EPA's access to records pertinent to its continuing effort to recover costs from other PRPs, Settling Defendants are required to retain relevant records for ten years and to notify the Government before disposing of such records. *See id.* § XII, ¶¶ 29–31.

As part of the proposed Consent Decree, Settling Defendants make several admissions and acknowledgements, and accept responsibility, with respect to the Site. *See id.* § V, ¶¶ 4–8. Each Settling Defendant respectively admits and accepts responsibility for directly or indirectly

---

[1] This memorandum of law contains an abbreviated summary of the terms and provisions of the proposed Consent Decree. If there is any conflict between the description of the settlement contained in this memorandum and the terms and provisions of the proposed Consent Decree, the terms and provisions of the proposed Consent Decree are controlling.

delivering mercury to Port Refinery as follows: (a) AIM delivered 1,033 pounds of mercury to Port Refinery during Port Refinery's period of operations; (b) Culp delivered 527 pounds of scrap mercury to Port Refinery during Port Refinery's period of operations; (c) Paramount's predecessor-in-interest, Westinghouse Electric Corporation ("Westinghouse"), delivered ten drums containing at least 600 pounds of surplus mercury residue to Port Refinery via a third-party broker during Port Refinery's period of operations, from which 250 pounds of mercury were recovered, refined, and returned to Westinghouse interest along with the ten drums containing processed mercury residue; and (d) PSNH sold 1,754 pounds of used mercury containing titanium or magnesium to William Hopkins d/b/a Spencer Transformer & Eequipment Inc. during Port Refinery's period of operations, and EPA has determined that this mercury and/or mercury-containing material came to be located at the Site. *Id.* § V, ¶¶ 5–8.

Settling Defendants also admit that EPA has determined Port Refinery took virtually no environmental precautions or safety measures during its mercury processing operations; that EPA has determined Port Refinery released a significant amount of mercury into the environment, contaminating the Site, which includes properties adjacent to Port Refinery's operations; and that Settling Defendants' mercury was comingled at the Site and contributed to the mercury released into the environment at the Site. *Id.* § V, ¶ 4.

The United States, on behalf of EPA, agrees in the Consent Decree not to sue or take administrative action under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), against Settling Defendants with regard to the Site. *See id.* § VIII, ¶ 17. As provided by Section 113(f)(2) of CERCLA, the Consent Decree provides that Settling Defendants are entitled to protection from contribution actions or claims for the matters addressed in the Consent Decree. *See id.*, ¶ 25. The Consent Decree provides that, upon approval by the Court, the Consent Decree

will constitute a final judgment of the Court as to claims raised in the complaint. *See id.* § XVIII, ¶ 41.

## ARGUMENT

### I. The Standard for Approval of a Proposed Consent Decree

Under the law of the Second Circuit, a court should approve a consent decree resolving civil enforcement claims of the Government where it is "fair and reasonable." *S.E.C. v. Citigroup Global Mkts., Inc.*, 752 F.3d 285, 294 (2d Cir. 2014); *accord United States v. Chestnut Petroleum Dist., Inc.*, No. 19-CV-03904 (PMH), 2020 WL 5505298, at *1 (S.D.N.Y. Sept. 11, 2020) (applying standard to environmental consent decree); *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 2014 WL 5825308, at *8 (S.D.N.Y. Nov. 10, 2014) (same); *United States v. IBM Corp.*, 2014 WL 3057960, at *1, *5 (S.D.N.Y. July 7, 2014) (same), *order clarified*, 2014 WL 4626010 (S.D.N.Y. Aug. 7, 2014). There are four primary factors to be considered in evaluating whether a settlement by a governmental enforcement agency is fair and reasonable:

> (1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind.

*Citigroup*, 752 F.3d at 294-95 (internal citations omitted).[2] "The primary focus of the inquiry . . . should be on ensuring the consent decree is procedurally proper, . . . taking care not to infringe on [the Government's] discretionary authority to settle on a particular set of terms." *Id.* at 295; *accord Chestnut Petroleum Dist.*, 2020 WL 5505298, at *1; *Tronox*, 2014 WL 5825308, at *8;

---

[2] Where a consent decree imposes an injunction, the Court must additionally consider whether the injunction "disserves the public interest." *Citigroup Global Mkts., Inc.*, 752 F.3d at 294. Because the Consent Decree does not impose injunctive relief, this additional test does not apply.

*IBM Corp.*, 2014 WL 3057960, at *2. This deferential approach reflects the "strong federal policy favoring the approval and enforcement of consent decrees." *Citigroup*, 752 F.3d at 293 (quoting *S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)). Indeed, "[a]bsent a substantial basis in the record for concluding that the proposed consent decree does not meet [these] requirements, the district court is required to enter the order." *Citigroup*, 752 F.3d at 294; *accord Chestnut Petroleum Dist.*, 2020 WL 5505298, at *1; *Tronox*, 2014 WL 5825308, at *8; *IBM Corp.*, 2014 WL 3057960, at *1.

**II.     The Proposed Consent Decree is Fair and Reasonable**

The four factors identified in *Citigroup* all support approval of the Consent Decree. First, there is no dispute as to the "basic legality of the decree." *Citigroup*, 752 F.3d at 294. A settlement agreement "satisfies this factor so long as it is within the Court's authority to enter the decree and within [the Government's] authority to enforce it." *IBM Corp.*, 2014 WL 3057960, at *2; *accord Chestnut Petroleum Dist.*, 2020 WL 5505298, at *2; *Tronox*, 2014 WL 5825308, at *9. Here, there is no question that the Court has authority to enter a Consent Decree recovering EPA's response costs under CERCLA. *See, e.g.*, 42 U.S.C. § 9607.

The second factor identified in *Citigroup*—"whether the terms of the decree, including its enforcement mechanism, are clear," 752 F.3d at 295—is likewise satisfied. From an enforcement perspective, the key terms of the proposed Consent Decree are straightforward. *See Chestnut Petroleum Dist.*, 2020 WL 5505298, at *2 ("[T]he Proposed Consent Decree outlines Defendants' agreement to pay a . . . civil penalty and the process associated therewith, the injunctive relief and reporting requirements, and the parties' agreement for stipulated penalties for violating the agreement." (citations omitted)); *Tronox*, 2014 WL 5825308, at *9 ("the terms of the decree, and its enforcement mechanism, are clearly stated in the Settlement Agreement"); *IBM Corp.*, 2014 WL 3057960, at *3 ("By clear, the Second Circuit appears to mean that the

7

decree properly defines its key provisions." (internal quotation marks omitted)). As described above, Settling Defendants' obligations to pay money; the stipulated penalties applicable in the absence of compliance; the recordkeeping requirements of the Consent Decree; and the other relevant provisions are clearly defined and unambiguously spell out Settling Defendants' obligations and applicable enforcement mechanisms against Settling Defendants. *See, e.g.*, Dkt. No. 3-1 ¶¶ 7, 10–11, 26–28.

The third factor—"whether the consent decree reflects a resolution of the actual claims in the complaint," *Citigroup*, 752 F.3d at 295—is also met. The complaint principally asserts claims for cost recovery against Settling Defendants, as well as seeking declaratory relief regarding their liability. *See* Compl. ¶¶ 46–54. The proposed Consent Decree resolves these claims. *See Chestnut Petroleum Dist.*, 2020 WL 5505298, at *2 (finding that the consent decree "resolves expressly those claims pressed by the EPA and provides the EPA with the relief sought in the Complaint"); *Tronox*, 2014 WL 5825308, at *9 (finding that settlement resolved all claims asserted the complaint, along with related environmental matters); *IBM Corp.*, 2014 WL 3057960, at *3 (finding that where settlement provided relief sought by the complaint, the settlement agreement satisfied third factor of *Citigroup*).

Finally, the fourth factor—"whether the consent decree is tainted by improper collusion or corruption of some kind," *Citigroup*, 752 F.3d at 295—is readily satisfied here. This settlement is the result of arm's-length negotiation between the United States and parties represented by counsel, and there is nothing to suggest improper collusion or corruption of any kind that would taint the negotiation process in this case.

## CONCLUSION

For these reasons, the Court should approve the proposed Consent Decree.

Dated: October 18, 2022
      New York, New York

                          Respectfully submitted,

                          DAMIAN WILLIAMS
                          United States Attorney

By:    s/ Anthony J. Sun
                          ANTHONY J. SUN
                          Assistant United States Attorney
                          86 Chambers Street
                          New York, New York 10007
                          Telephone: 212-637-2810
                          Facsimile: 212-637-2786
                          anthony.sun@usdoj.gov

                          *Attorney for the United States of America*